NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

ANDRE LAMONT WILSON, JR.,           )
                                    )
          Appellant,                )
                                    )
v.                                  )          Case No. 2D15-1730
                                    )
STATE OF FLORIDA,                   )
                                    )
          Appellee.                 )
                                    )
_____)

Opinion filed April 4, 2018.

Appeal from the Circuit Court for Highlands
County; J. Dale Durrance, Judge.

Howard L. Dimmig, II, Public Defender,
and Carol J.Y. Wilson, Assistant Public
Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Brandon R. Christian,
Assistant Attorney General, Tampa, for
Appellee.


CASANUEVA, Judge.

          Andre Lamont Wilson, Jr., appeals his judgments for burglary of an

occupied structure while armed with a firearm, robbery with a firearm, aggravated

battery with a firearm, and two counts of armed kidnapping with a firearm.  Mr. Wilson

was sentenced to fifteen years in prison on the aggravated battery count and

consecutive life sentences with a ten-year minimum mandatory term for the remaining counts. Each conviction factually stemmed from a robbery of a Pizza Hut on December 12, 2012.

The issue presented by Mr. Wilson is whether the conduct of law enforcement officers during his interrogation violated protections afforded him by the Constitution of the United States and the Constitution of the State of Florida and, more specifically, those protections provided by Miranda v. Arizona, 384 U.S. 436 (1966). Based on our review of the record, including the audio and video recording of the interrogation, we conclude that the confession given by Mr. Wilson, elicited prior to the administration of Miranda warnings, was obtained improperly. The trial court erred in denying Mr. Wilson's motion to suppress, and this error was not harmless.

We are required to reverse and remand for further proceedings and note that "[t]he disadvantage of the Miranda rule is that statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result." Dickerson v. United States, 530 U.S. 428, 444 (2000).

## I. FACTS AND PROCEDURAL BACKGROUND

On December 18, 2012, Mr. Wilson agreed to meet with officers of the Sebring Police Department at a park near his home. He had contacted the officers at the request of a friend. When the officers arrived at the park, they asked if Mr. Wilson would be willing to talk with them at the station. He agreed, and the officers gave him a ride in their vehicle.

At the beginning of the interview, Mr. Wilson did not know what the officers wanted to discuss with him. Mr. Wilson stated that he needed to leave by 3:30 p.m. to meet someone. The officer responded, "[Y]ou won't be here that long. And like I said, we'll ride you home whenever you're ready." They also told him where the exits were and told him he was free to leave at any time.

The interview was held in a small room with a closed door at the station. It began around 2 p.m. and ended just after 5:30 p.m. Minutes into the questioning, Mr. Wilson was told, "Well, the reason we're here to talk to you today is we've had a series of robberies in which you have become a suspect."

Mr. Wilson denied any involvement, but the officers were not deterred. The officers stated that they had collected evidence from the scene and that they knew he was involved. The officers stated they were willing to work with him, but he needed to "stop playing games" and "start either coming clean or you're going to end up taking the ride." The officers pressed him with increasing details of evidence implicating him in the crime, including DNA and fingerprints found on items linked to the robbery. These items were found at the house of his friend, Terrell. They stated they had GPS data and phone call recordings and could place Mr. Wilson at that house just after the robbery. After some time, Mr. Wilson acknowledged he may have touched a gun that was at the friend's house, but he denied using the gun, denied owning a cell phone, and denied any involvement in the robbery.

The officers responded that it was obvious he was not telling the truth "because the gun that you've tied yourself to was used in an armed robbery. . . . So all this stuff that you're giving is just tying you more and more and more to the armed

robbery."  They went on to tell him, "I can look you in the eye and without a shadow of a doubt, all right, through forensics and DNA and other evidence and other statements put you in Pizza Hut" at the time of the robbery.  "I know the last thing you want is another armed robbery with a firearm charge. . . .  Without us talking to the State Attorney, that will send you up for a number of Christmases and a number of your birthdays."

They told him that a shot was fired from a gun during the robbery, making it "a 10/20/Life[1] case."  They also stated that they had his DNA on a gun that was fired and that they recovered a projectile and casing from the scene.  After further denials, one officer stated: "We know pretty much what's happened.  All right.  We wanted to give you the opportunity to be forthcoming, so we can tell the State Attorney that you need a second chance."  After explaining that they had "a stack of evidence" against Mr. Wilson, one officer stated: "When it comes down, it's going to come down so hard until there's nothing that we can do for you. . . .  We're giving you the opportunity to continue your life."

Mr. Wilson was told that they could have arrested him already and, if he continued to deny his involvement, "when we present it to the State Attorney, all right, they are going to issue a warrant for your arrest.  And you're going to go to jail."  However, they offered him a way out and stated they were willing to recommend probation if he would tell them the truth, but this was a one-time offer.

The officers explained that they believed he was the driver for the robbery and they could track him to Terrell's house where the stolen money and employees' cell phones were found, along with face masks and guns.  After giving him a bottle of water,

---

[1]See § 775.087(2)(a), Fla. Stat. (2012).

they explained that they believed he was worth saving, and so they wanted to give him a second chance at life if he would tell the truth. The officers then explained that they would be willing to recommend that his prior robbery charge and the instant case be lumped together and that he receive a total of eight years of probation. When Mr. Wilson questioned the impact of a recommendation, one officer reassured him: "I've been a cop 16 years. . . . I have never seen the State not go with the recommendations that we make." The officers agreed to "stand up" for Mr. Wilson and recommend no prison time. When Mr. Wilson stated, "I don't want to go to prison," one officer offered to put on the record, "I promise you I will go to the State Attorney and recommend that you catch probation. No prison time." The other two officers agreed, and they told him that they needed to get the truth from him that day: "In other words, you can't leave here today and think about it and call us tomorrow. . . . [I]t's all or nothing right here right now."

Mr. Wilson expressed interest in the plan, asked for a pen and paper to get the officers' names, and then asked to use the phone. Mr. Wilson stated, "I just want to get my lawyer's opinion on this. . . . I just want to get my lawyer's opinion of it." The officer said that was fine, it was his right, but it would end the discussion. Mr. Wilson said, "I just want to just like see if that's—that's even possible what you guys are telling me." Then the officer presented an alternative to Mr. Wilson calling his lawyer, stating: "I'll do you one better. . . . I'll bring you our boss in. All right. And you can ask him."

The other officers exited, and the boss came in and spent some time answering Mr. Wilson's questions one-on-one. He explained that the officers would

make a recommendation based on his cooperation and, while they could not give a guarantee, he could very possibly get house arrest. He explained that he was getting this offer before any of the other suspects and told Mr. Wilson that it could not hurt him in any way to work with the officers.

At the end of this consultation, Mr. Wilson seemed reassured and stated, "I just wanted to get it from another opinion." The sergeant reiterated, "You ain't got nothing to lose." The steps of the plea negotiations were explained, the three officers further assured Mr. Wilson, "[W]e're going to go to bat for you," and Mr. Wilson then gave his confession that was later placed, as evidence, before the jury.

After giving his recorded statement confessing to his involvement in the armed robbery, Mr. Wilson was in fact permitted to go home, and it was not until a follow-up interview the next day that Mr. Wilson was advised of his constitutional rights, commonly known as the Miranda warnings.

On April 2, 2014, Mr. Wilson filed a motion to suppress his statement, asserting that it was obtained during an improper custodial interrogation, that it was obtained by coercion, and that he had invoked his right to counsel which was ignored. Counsel for Mr. Wilson and for the State stipulated that the trial court would review the recording of the interview off the record and thereafter rule on the motion to suppress. Later, when asked by the parties if the trial court had an opportunity to review that evidence, the trial court indicated that it had, and the motion to suppress was denied with no oral or written findings of fact.

The case went to trial in March 2015, and the State presented testimony that three masked men with guns robbed the Sebring Pizza Hut. Police located cash, a

key from the restaurant, guns, and the employees' cell phones at Terrell's house. They found a projectile and casing at the Pizza Hut matching one of the guns, but no prints of value were found on the firearms or plastic bags containing the stolen items. Over defense objection, the State played for the jury Mr. Wilson's statement in which he admitted that he drove to the Pizza Hut in a mask, held a revolver, got a worker to open the back door, and stayed at the back of the restaurant while two others went inside to get the money. None of the evidence referenced during the interrogation was used to link Mr. Wilson to the robbery, and none of the witnesses identified him as being a participant in the robbery or at Terrell's house that night; the State's case was based primarily on Mr. Wilson's confession.

## II. ANALYSIS

### A. Standard of Review

In reviewing a trial court's decision on a motion to suppress, we afford a presumption of correctness to the trial court's findings of facts, but the application of those facts to the law is reviewed de novo. Wyche v. State, 987 So. 2d 23, 25 (Fla. 2008). This court must interpret the evidence and the reasonable inferences to be drawn from the evidence in a manner most favorable to sustaining the trial court's ruling. Martin v. State, 107 So. 3d 281, 298 (Fla. 2012) (citing Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002)).

### B. Custodial Interrogation

Here, the motion to suppress sought to exclude the statements made by Mr. Wilson while being questioned at the station. We pause to note that neither the United States Constitution nor the Florida Constitution requires the exclusion of all

statements of confession made by an accused. "Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." United States v. Washington, 431 U.S. 181, 187 (1977). What is prohibited is the admission of governmentally compelled statements.

We look to the language of the Fifth Amendment to the Constitution of the United States to determine the parameters of its field of protection. It provides, in pertinent part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. These protections apply to the States by virtue of the Fourteenth Amendment. Maryland v. Shatzer, 559 U.S. 98, 103 (2010) (citing Malloy v. Hogan, 378 U.S. 1, 6 (1964)). The protection against self-incrimination is also set forth in article I, section 9, of the Florida Constitution, and this fundamental right must be broadly construed. Myers v. State, 211 So. 3d 962, 966 (Fla. 2017) (citing State v. Horwitz, 191 So. 3d 429, 439 (Fla. 2016)).

"Statements obtained from a defendant in violation of the right against self-incrimination (also known as a 'privilege') cannot be used against the defendant at trial." Cuervo v. State, 967 So. 2d 155, 160 (Fla. 2007). A suspect who is subjected to a custodial interrogation must be made aware of his or her constitutional right against self-incrimination, and this is accomplished through Miranda warnings. Myers, 211 So. 3d at 971; see Ramirez v. State, 739 So. 2d 568, 573 (Fla. 1999) (noting Miranda enunciates a "bright-line rule to guard against compulsion and the coercive nature and atmosphere of custodial interrogation"). "Under Miranda . . . , statements made to the police in the course of a 'custodial interrogation' must be suppressed if the police have not informed the suspect of his constitutional rights prior to the interrogation." State v.

Pitts, 936 So. 2d 1111, 1123 (Fla. 2d DCA 2006); see also State v. McAdams, 193 So. 3d 824, 833 (Fla. 2016) (citing Missouri v. Seibert, 542 U.S. 600, 608 (2004), and Deviney v. State, 112 So. 3d 57, 79 (Fla. 2013)).

In Oregon v. Elstad, 470 U.S. 298, 306-07 (1985), the Supreme Court set forth the operation of the Miranda decision:

> The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

(Footnote omitted.) It is the State's burden to prove that a statement was voluntarily made. See Ross v. State, 45 So. 3d 403, 418 (Fla. 2010) (citing Ramirez, 739 So. 2d at 573).

Because Miranda warnings are necessary only when a suspect undergoes a custodial interrogation, we must first determine whether Mr. Wilson was in custody and, if so, whether he was interrogated while in custody. See Hunter v. State, 8 So. 3d 1052, 1063 (Fla. 2008). We acknowledge that in this area of law, "while precedent remains a guide, custody determinations are heavily fact dependent." McAdams, 193 So. 3d at 833 (citing Rigterink v. State, 2 So. 3d 221, 246 (Fla. 2009), vacated on other grounds, 559 U.S. 965 (2010)). Nonetheless, we continue to examine precedent as it

sheds probative light on our factual examination. The element of interrogation is more easily determined in this case, and we will consider it first.

## 1. Interrogation

We observe that an interrogation takes place "when a state agent asks questions or engages in actions that a reasonable person would conclude are intended to lead to an incriminating response." Id. Based on our review of the record, we conclude that this standard was clearly met. The motivating purpose of the interview right from the start was to obtain incriminating evidence regarding Mr. Wilson's involvement in the robbery. Officers made promises of leniency, made representations that he did not need an attorney and that he could rely upon the good offices of the police department, and used other techniques to obtain the desired incriminating evidence. Ultimately, Mr. Wilson did incriminate himself. Because this standard was unequivocally met, we turn to the custodial determination.

## 2. Custody

To determine whether a person is in custody as contemplated by Miranda, both the United States Supreme Court and the Supreme Court of Florida have adopted an objective, reasonable person framework. The federal standard has been articulated as "how a reasonable person in the suspect's situation would perceive his circumstances." Yarborough v. Alvarado, 541 U.S. 652, 662 (2004). In Connor v. State, 803 So. 2d 598, 605 (Fla. 2001), the Florida Supreme Court said that to meet the standard it "must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of

movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police."

When determining whether a person is in custody, courts must examine: "(1) the 'circumstances surrounding the interrogation;' and (2) 'given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " McAdams, 193 So. 3d at 833 (quoting Ross, 45 So. 3d at 415); see also Caldwell v. State, 41 So. 3d 188, 197 (Fla. 2010) (stating "[t]he standard for 'custody' is whether, based on the totality of the circumstances, a reasonable person would feel that his freedom of movement has been restricted to a degree associated with an actual arrest").

The question of whether Mr. Wilson was "in custody" is a mixed question of law and fact, which we review using a two-step process. Connor, 803 So. 2d at 605. This court is required to "defer to a trial court's findings of fact as long as they are supported by competent, substantial evidence, but we review de novo a trial court's application of the law to the historical facts." Ross, 45 So. 3d at 414. As previously observed, the trial court did not articulate any findings of fact. However, we are able to review the same evidence reviewed and relied upon by the court in making its ruling, i.e., the video recording of Mr. Wilson's interview.

To evaluate how a "reasonable person" in Mr. Wilson's position would have perceived the situation, we consider the four factors set forth in Ramirez, 739 So. 2d at 574. In doing so, the point of perception is not that of the inquiring law enforcement officer but that of a reasonable person in the suspect's position. The four factors are:

> (1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.

Id.

The first factor weighs in the State's favor. Mr. Wilson agreed to meet the officers at a park near his home. At the officers' request, Mr. Wilson, who was barefoot, accepted a ride to the station in the officers' vehicle. He was not handcuffed, and they assured him that they would bring him back to the park at the conclusion of the interview. After reviewing the record, we conclude that Mr. Wilson voluntarily agreed to be transported for the interview.

We next examine the second factor—the purpose, place, and manner of the questioning. The place of questioning was a small room at the police station. While questioning at the police station is not determinative of whether the interrogation was "custodial," it is certainly consistent with a custodial interrogation. See Pitts, 936 So. 2d at 1126 ("Most custodial interrogations take place in a police station, and a defendant's presence in a station while subjected to questioning undoubtedly can have a bearing on how a reasonable person in the defendant's situation views his status."). The record further discloses that multiple officers entered and exited the room throughout the interrogation, and multiple officers were present for almost all of the interview.

As for purpose and manner, it is clear that the purpose of the questioning from the inception of the interview was to pressure Mr. Wilson to explain his involvement in the Pizza Hut robbery and to obtain a confession. The manner of the questioning supports this conclusion. Questioning was confrontational and accusatorial,

and Mr. Wilson was pressured throughout the interview to "tell the truth" and explain his involvement in the robbery.  The officers were clearly frustrated by Mr. Wilson's continued denial as to any involvement or knowledge, and they made it clear that this was his one opportunity to cooperate with them and receive their assistance by admitting his involvement.

In Ross, 45 So. 3d at 415, the suspect was initially asked to give a statement and then was questioned about inconsistencies in his story.  He was then confronted with evidence against him, and "the detective's focus shifted from merely questioning a witness to attempting to obtain a confession and pressuring Ross to admit his involvement in the crime.  The detective repeatedly told Ross that he knew Ross committed the crime and the only question remaining was why."  Id. at 415-16.  Ross was questioned in a highly confrontational and accusatorial manner for hours in a small room at the station by at least two officers.  When Ross asked for a smoke break, he was told to smoke in the room and questioning continued.  The supreme court concluded that, as to this Ramirez factor, the record clearly supported a conclusion that Ross was in custody.

Likewise, the questioning of Mr. Wilson was confrontational and accusatorial almost from the start of the interview.  They told him right out of the gate that he was a suspect in a series of robberies, and they specifically mentioned an armed robbery at a Pizza Hut on December 12, 2012.  When he claimed to have no knowledge of or involvement in the robbery, the officers told him they had a stack of evidence against him, including DNA, fingerprints, ballistics, and voice forensics, and they said unequivocally that they could place him at the Pizza Hut during the robbery.

In response to continued denials of any involvement, the officers stated that they knew he was lying, told him to stop playing games, and reminded him that this was a 10/20/Life crime while he was awaiting sentencing on another robbery charge. They told him that they had sufficient evidence to arrest him already. Mr. Wilson was told on more than one occasion that only one of the perpetrators would get the benefit of cooperation. The final effect was to obtain a confession. We conclude that this factor weighs against the State and in support of a conclusion that Mr. Wilson was in custody at the time he made his confession.

The third factor to consider is the extent to which Mr. Wilson was confronted with evidence of his guilt, and we note that the circumstances of this factor can weigh heavily in the determination of whether the suspect was in custody. Pitts, 936 So. 2d at 1127. The importance of this factor was explained in Pitts as follows:

> A reasonable person in the situation of a suspect who has been "confronted with evidence strongly suggesting his guilt" may well understand that such evidence means that the police will not allow the suspect to go on his way. . . . If a reasonable person in the suspect's position would understand that the police have probable cause to arrest the suspect for a serious crime such as murder or kidnapping, that circumstance militates strongly toward the conclusion that the suspect is in custody.

Id. at 1127-28 (footnote omitted).

Here, the transcript reveals the frequent and extensive use of this information throughout the interview, some of which we have already set forth. As noted in the discussion of the second factor, the officers repeatedly informed Mr. Wilson that they had physical evidence against him, including DNA and fingerprints, and fingerprints and DNA "don't lie." They explained that they had a gun with his DNA on it

- 14 -

and a casing that proved that the gun had been fired at the Pizza Hut; they had ski masks that a witness confirmed were used during the robbery, and they were certain his DNA would be on one; and they had GPS data and cell phone calls confirming his involvement.  When he offered an innocent explanation for why his fingerprints might be found on a gun at Terrell's house, the officers told him that he was just tying himself more and more to the armed robbery.

In McAdams, the defendant was similarly presented with evidence of his guilt, including DNA evidence.  193 So. 3d at 843.  When the defendant posited an innocent explanation, the detective responded immediately that his explanation was inconsistent with the evidence.  Further, the detective "created an atmosphere of inevitability when he told McAdams that he would not be allowed a couple of days to think about the situation."  Id.

As in McAdams, Mr. Wilson was confronted with evidence that strongly suggested his guilt, and this continued despite his repeated denials.  While "the significance of this factor may be diminished if the police do not express their belief in the suspect's guilt or do nothing to refute the suspect's offered explanation of innocence," Meredith v. State, 964 So. 2d 247, 251 (Fla. 4th DCA 2007) (citing Stansbury v. California, 511 U.S. 318, 325 (1994), and Pitts, 936 So. 2d at 1128), the officers did just the opposite here.  When Mr. Wilson asserted his innocence and disputed the claims that he was involved, the officers accused him of lying, told him to stop playing games, and indicated that his arrest was inevitable.  We conclude that this important factor weighs in favor of a finding of custody.

The final factor is whether Mr. Wilson was informed that he was free to leave the place of questioning.  At first glance, this factor appears to weigh in favor of the State.  At the outset of his contact with the officers in this case, Mr. Wilson was told that he was free to go, shown the way out, and told that no matter what he said he would not be arrested that day.  In fact, he was not arrested that day and was returned to his car after giving his statement.

However, we note that the officers' questioning as the interview progressed suggested that Mr. Wilson was free to leave only after admitting to his involvement.  One officer stated:

> You are going back to your car at Lake June Park when this conversation is over.  I give you my word as a Christian on that.  All right.  You are not leaving from here to go to jail.  I—but here is the deal.  Plain and simple, 1,000 percent, we can put you inside Pizza Hut on December 12th of this year.

Another officer later stated, "[W]hen we are done here you're back to your car."  Mr. Wilson asked, "[W]hat do you want from me?"  And the officer answered, "I want the truth, Andre."  He again denied involvement, and the questioning continued despite Mr. Wilson expressing concern over the time and needing to meet someone at 3:30.  After the officers gave assurances that they would go to bat for him if he told the truth, Mr. Wilson asked, "And then I get to go home?"  The officer confirmed, "Absolutely. . . . After we get through with this, we'll head off."  Shortly thereafter, Mr. Wilson made a confession.

We recognize again that each suppression case is highly fact-dependent.  Similar conduct may not suggest a custodial interrogation when viewed in isolation or under a different set of circumstances.  However, Mr. Wilson had not been read his

<u>Miranda</u> warnings, had been repeatedly told that the officers could have already arrested him if they wanted to, and if he continued to deny his involvement, the State Attorney would direct them to do just that. He had been driven to the station in his bare feet and was interviewed with multiple officers in the room at a time, all while being presented with accusations and evidence of his guilt. Thus, while Mr. Wilson was told that he was free to leave, these statements were qualified by the officers' words and actions such that this factor does not weigh in favor of the State and is, at best, in equipoise.

As the supreme court noted in <u>McAdams</u>: "[T]here is not necessarily a single specific comment, question, or circumstance that converts an encounter from noncustodial to custodial. A situation can commence as a voluntary interaction with police, but slowly intensify and become more pressured, pointed, and accusatory until it evolves into custodial status." 193 So. 3d at 839. That is precisely what occurred here. We find that, under the totality of the circumstances, a reasonable person in Mr. Wilson's situation would not have felt free to leave, and thus we conclude that Mr. Wilson was in custody at the time he made his statement.

### 3. Right To Counsel

Having concluded that Mr. Wilson was in custody at the time he gave his statement, we turn to his argument that the confession should have been excluded as provided in violation of his right to counsel. The United States Supreme Court has held that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." <u>Davis v. United States</u>, 512 U.S. 452, 457

(1994) (citing <u>Miranda</u>, 384 U.S. at 469-73).  Similarly, the Florida Supreme Court has held that, to ensure the voluntariness of a confession, prior to custodial interrogation, suspects must be informed "that they have a right to a lawyer's help, and that if they cannot pay for a lawyer one will be appointed to help them."  <u>Traylor v. State</u>, 596 So. 2d 957, 965-66 (Fla. 1992) (footnote omitted) (referencing Article 1, Section 9, of the Florida Constitution).

As we have already concluded, Mr. Wilson was subjected to custodial interrogation.  "[T]he primary protection afforded suspects subject to custodial interrogation is the <u>Miranda</u> warnings themselves."  <u>Davis</u>, 512 U.S. at 460.  No such warnings were given here.  To make matters worse, Mr. Wilson requested the assistance of counsel prior to giving his confession.  The following exchange took place:

A. I just want to get my lawyer's opinion on this.

Q. Huh?

A. I just want to get my lawyer's opinion of it.

Q. And that's fine.

A. If we can --

Q. Understand this though.  If you want a lawyer, we can't
talk to you anymore.

A. Yeah.

Q. Okay.  And that's your right.

A. No, I don't want it.  I just want to just like see if that's --
that's even possible what you guys are telling me.

Q. Okay.  I'll do you one better.

A. All right.

Q. I'll bring you our boss in.  All right.  And you can ask him.

Whenever constitutional rights are at issue, our Supreme Court has said that law enforcement officers must use "common sense."  State v. Glatzmayer, 789 So. 2d 297, 305 (Fla. 2001) (citing Almeida v. State, 737 So. 2d 520, 526 (Fla. 1999)).  Here, common sense would require the officers to stop and afford Mr. Wilson an opportunity to contact counsel, particularly as during the custodial interrogation the Miranda warnings had not been provided.  The Florida Supreme Court noted in Almeida that both sides benefit from disclosure regarding the rights available to the suspect:

> Disclosure ensures that any subsequent waiver will be knowing and intelligent, and it reaffirms those qualities in a prior waiver.  Nondisclosure, on the other hand, is doubly harmful: It exacerbates the inherently coercive atmosphere of the interrogation session, and it places in doubt the knowing and intelligent nature of any waiver—whether prior or subsequent.

737 So. 2d at 525 (footnote omitted).

The surrounding context in which Mr. Wilson's words were spoken is also important.  See State v. Sepanik, 110 So. 3d 977, 980 (Fla. 2d DCA 2013).  Here, context adds to the conclusion that Mr. Wilson was seeking to consult with his attorney and was invoking his right to do so.  Indeed, he made the request twice.  He was not only discouraged from doing so, he was offered the advice of a senior law enforcement officer as a better alternative.  The impact was to " 'steamroll' the suspect."  See Almeida, 737 So. 2d at 525.  That is, "to actively promote the very coercion that Traylor was intended to dispel."  Id. (citing Traylor, 596 So. 2d at 966).

As to Mr. Wilson's first basis for suppression, we conclude that Mr. Wilson was subjected to a custodial interrogation and officers failed to provide him Miranda

- 19 -

warnings, resulting in a presumption of compulsion.  See Elstad, 470 U.S. at 307.

Further, he was denied his right to the assistance of counsel.  Consequently, Mr.

Wilson's statement elicited prior to the administration of Miranda warnings was not

voluntarily given and should have been suppressed.

### C. Coercion

Next, Mr. Wilson contends that his statement should have been

suppressed because it was obtained by improper coercion.  In Miller v. Fenton, 474

U.S. 104, 109 (1985), the Court held that, under the Due Process Clause of the

Fourteenth Amendment, certain interrogation techniques are forbidden.  Those "certain

interrogation techniques, either in isolation or as applied to the unique characteristics of

a particular suspect, are so offensive to a civilized system of justice that they must be

condemned."  Id.

Discussing the Due Process Clause's application to interrogation

techniques, Chief Justice Rehnquist, writing for the Supreme Court, observed that

"coercive government misconduct was the catalyst for this Court's seminal confession

case, Brown v. Mississippi, 297 U.S. 278[ ] (1936)."  Colorado v. Connelly, 479 U.S.

157, 163 (1986).  Furthermore, "the cases considered by this Court over the 50 years

since Brown v. Mississippi have focused upon the crucial element of police

overreaching."  Id.  And while police overreaching is a focus, it is not the sole focus;

there must be a nexus between the police overreaching and the suspect's confession.

Id. at 165.

"[A] main focus of Florida confession law has always been on guarding

against one thing—coercion."  Traylor, 596 So. 2d at 964.  A statement obtained as a

- 20 -

result of overreaching or coercive police conduct is subject to exclusion on due process grounds. Baptiste v. State, 179 So. 3d 502, 506 (Fla. 1st DCA 2015); see also Brewer v. State, 386 So. 2d 232, 235 (Fla. 1980). In determining whether the confession was voluntary, we use the identical standard used in federal court prosecutions. See Brewer, 386 So. 2d at 235. The inquiry is whether the confession was the product of free will and rational choice. Martin, 107 So. 3d at 298.

A confession or statement is determined to be involuntary where, considering the totality of the circumstances, we "conclude that the defendant was unable to make a choice free from unrealistic hope and delusions as to his true position, due to the officer's conduct." Baptiste, 179 So. 3d at 506 (quoting Ramirez v. State, 15 So. 3d 852, 856 (Fla. 1st DCA 2009)); see Traylor, 596 So. 2d at 964 (stating coercion is not limited to direct promises or threats; "[i]t is sufficient, if the attending circumstances, or declarations of those present, be calculated to delude the prisoner as to his true position, and exert an improper and undue influence over his mind" (quoting Simon v. State, 5 Fla. 285, 296 (1853))); Brewer, 386 So. 2d at 235-36.

While evaluating the totality of circumstances surrounding the confession, the court must examine any promise or misrepresentation made by a state actor to the accused. Martin, 107 So. 3d at 298. The challenged conduct must constitute outrageous behavior, and it must be established that the improper police conduct, to wit, the outrageous behavior, had a causal nexus to the confession. Bussey v. State, 184 So. 3d 1138, 1141 (Fla. 2d DCA 2015). It is the State's burden to prove by a preponderance of the evidence that the statement was freely and voluntarily given. Martin, 107 So. 3d at 293.

This court in Bussey reiterated the long-standing rule that "a confession cannot be obtained through direct or implied promises." Bussey, 184 So. 3d at 1141 (quoting Johnson v. State, 696 So. 2d 326, 329 (Fla. 1997)). In Brewer, a confession given in response to threats and promises was involuntary and inadmissible where "[t]he officers raised the spectre of the electric chair, suggested that they had the power to effect leniency, and suggested to the appellant that he would not be given a fair trial." 386 So. 2d at 235. However, simply advising a suspect of the potential consequences of a crime does not constitute a threat, and encouraging cooperation with law enforcement does not constitute coercive conduct. Bussey, 184 So. 3d at 1141. Like in Bussey and the cases reviewed therein, we examine the totality of the circumstances surrounding the confession.

Mr. Wilson was presented with two options: he could either cooperate and be the one who obtained the benefit of the officers' assistance and influence with the appropriate authorities, such as the State Attorney's Office and the trial court, or he could continue to deny involvement, be arrested as soon as the next day, and the prosecution will "hammer you. . . . [A]s hard as they possibly can." Pressure alone does not convert a confession into an involuntary statement. However, the record in this case reveals circumstances, including the absence of Miranda warnings and certain statements by the officers calculated to delude Mr. Wilson as to his true position, exerted an improper and undue influence over Mr. Wilson's mind such that we cannot say that his confession was freely and voluntarily given.

The confession here followed suggestions by the officers that they had the power to effect leniency and "save" Mr. Wilson's life. Cf. Brewer, 386 So. 2d at 233-34.

While the death penalty was not on the table in this case as it was in <u>Brewer</u>, the officers stated that Mr. Wilson was a suspect in a "string of robberies," noted that this was "a 10/20/Life crime," and made it clear that Mr. Wilson was looking at significant prison time if he failed to cooperate and give a statement. They presented themselves as his only option to avoid this fate and promised to recommend probation.[2]

We have not overlooked the fact that the officers spoke in terms of recommendations, and the sergeant informed Mr. Wilson that the officers could give no guarantee as to the sentence he would receive. However, these statements were undermined by the officer's representation that, in sixteen years, the State had always taken the officer's recommendation. The long-time officers used their seniority to offer unrealistic hope in the form of assurances that their recommendation of probation would be accepted if Mr. Wilson would just tell them the truth about his involvement in the robbery.

The officers exacerbated the coercive impact of the misrepresentations when Mr. Wilson asked to call his attorney and get his opinion about the deal being presented. In response to this request, one officer stated: "I'll do you one better. . . . I'll bring you our boss in. All right. And you can ask him." Mr. Wilson stated he wanted to get his lawyer's opinion, he was offered the sergeant's opinion as a better alternative, and, having received the sergeant's opinion, Mr. Wilson provided his confession. All of this took place without Mr. Wilson having been given <u>Miranda</u> warnings.

---

[2]The 10/20/Life statute carries a minimum mandatory prison term, a fact likely known to these experienced law enforcement officers. <u>See</u> § 775.087(2)(a).

We find that, under the totality of the circumstances, the suggestions that the officers could effect such leniency, coupled with the representation that the sergeant's opinion was superior to that of his own counsel, amount to outrageous police conduct. Further, we find a clear nexus between the outrageous conduct and Mr. Wilson's confession. Therefore, we conclude that the confession was not freely and voluntarily given. Such a coerced confession should have been suppressed.

## III. HARMLESS ERROR ANALYSIS

The erroneous admission of Mr. Wilson's confession is subject to a harmless error analysis. See McAdams, 193 So. 3d at 843. Pursuant to State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986), the harmless error test requires the State "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction."

In analyzing the impact the error had on the verdict, we must examine both the permissible evidence presented to the jury for consideration and the impermissible evidence that may have influenced the jury. Id. In this case, the improperly admitted statement was the primary if not the only evidence tying Mr. Wilson to the robbery. Thus, we cannot conclude that the erroneous admission of the confession did not contribute to the convictions in this case.

## IV. CONCLUSION

We conclude that Mr. Wilson's statement should have been suppressed because he was subjected to custodial interrogation and did not receive <u>Miranda</u> warnings. We further conclude that the statement should have been suppressed as it was coerced through improper police conduct, and he was denied his right to counsel. The trial court erred in admitting Mr. Wilson's statement, and that error was not harmless. Accordingly, we reverse and remand for a new trial at which the evidence of his statement must be suppressed.

Reversed and remanded.


KHOUZAM and BADALAMENTI, JJ., Concur.