NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

DARIUS DUQUAN BUSSEY,                    )
                                         )
                    Appellant,           )
                                         )
v.                                       )        Case No. 2D14-275
                                         )
STATE OF FLORIDA,                        )
                                         )
                    Appellee.            )
                                         )
_____  )

Opinion filed October 14, 2015.

Appeal from the Circuit Court for Pinellas
County; Keith Meyer, Judge.

Howard L. Dimmig, II, Public Defender, and
Steven G. Mason, Special Assistant Public
Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Brandon R. Christian,
Assistant Attorney General, Tampa, for
Appellee.


MORRIS, Judge.

          Darius Bussey appeals his conviction for first-degree murder.  We reverse

the conviction because the trial court erred in denying Bussey's motion to suppress his

statements made during an interview with detectives and the admission of his

statements cannot be considered harmless.  He raises other issues on appeal that have no merit and do not warrant discussion.

## I. Background

On January 5, 2012, a grand jury indicted Bussey for the first-degree premeditated murder of Mohamed Islam.  On December 28, 2011, Islam was working at a convenience store in Largo, Florida, when he was shot by a single perpetrator during an apparent robbery.  The crime was caught on the store's several surveillance cameras.

Prior to trial, Bussey filed a motion to suppress statements he made to two Pinellas County Sheriff's Office detectives during an interrogation in Lowndes County, Georgia, on January 2, 2012.  A warrant had been issued for his arrest in this case, and Bussey was being held in Georgia after he turned himself in on an unrelated misdemeanor warrant.  The detectives traveled to Georgia to question Bussey regarding Islam's death.  They advised him of his Miranda[1] rights, and ultimately, Bussey admitted to committing the robbery but stated that he accidentally shot Islam.  In his motion to suppress the statements, Bussey argued that his confession was obtained in violation of his Miranda rights because the police failed to cease questioning after he invoked his right to remain silent.  He also argued that the detectives used coercive techniques, such as promises of leniency, threats of the death penalty, and appeals to his religion, and that such coercion rendered his statements involuntary.

The trial court held a hearing on Bussey's motion to suppress.  The State introduced the testimony of one of the detectives, as well as an audio CD of the

---

[1]Miranda v. Arizona, 384 U.S. 436 (1966).

interview and a transcript of the interview. After the hearing, the trial court entered an order denying Bussey's motion to suppress. Regarding the right to remain silent, the trial court concluded that Bussey never made "an unequivocal invocation of his right to remain silent which would have necessitated the cessation of the interview." The trial court also concluded that the techniques employed by the detectives did not amount to the type of psychological coercion that would render his statements involuntary. The trial court found that the detectives did not make promises of leniency but instead advised Bussey of the potential penalties he faced. Regarding threats of the death penalty, the trial court concluded that the numerous references to the death penalty constituted the "legally acceptable tactic" of informing Bussey "of the realistically expected penalties for first[-]degree murder[] and the realistically expected penalties if the crime was not first[-]degree murder." As for the detectives' appeal to Bussey's religion, the trial court concluded that the detectives were encouraging Bussey to tell the truth, which was not an improper coercive technique.

Bussey proceeded to a jury trial in December 2013. He was convicted as charged and sentenced to a minimum mandatory term of life in prison for the discharge of a firearm.

## II. Analysis

On appeal, Bussey argues that the trial court erred in denying his motion to suppress because the detectives' promises of leniency and threats of the death

penalty amounted to coercion that crossed constitutional boundaries and rendered his confession involuntary. We agree.[2]

We accord a presumption of correctness to the trial court's findings of facts, but we must independently review mixed questions of law and fact that ultimately determine constitutional issues. Martin v. State, 107 So. 3d 281, 293 (Fla. 2012). This court must interpret the evidence and the reasonable inferences to be drawn from the evidence in a manner most favorable to sustaining the trial court's ruling. Id. at 298. "The test to determine whether a confession is voluntary—in other words, not coerced— is whether it was the product of free will and rational choice." Id. at 298. The court should make this determination after considering the totality of the circumstances surrounding the confession, including "any promises or misrepresentations made by the interrogating officers." Id. "It is well established that a confession cannot be obtained through direct or implied promises." Johnson v. State, 696 So. 2d 326, 329 (Fla. 1997). But, generally, "[t]o advise a suspect of potential penalties and consequences does not amount to a threat," and "encouraging a suspect to cooperate with law enforcement is not coercive conduct." Martin, 107 So. 3d at 305. "To render a statement inadmissible, the threat or promise must constitute 'outrageous behavior' that induces the confession

---

[2]Bussey also contends on appeal that the detectives failed to honor the invocation of his right to remain silent when he stated numerous times throughout the interview that he was done talking. But we agree with the trial court that Bussey's comments were equivocal because he continued to speak to the detectives each time without the detectives initiating further questions. Because Bussey continued to talk on his own, a reasonable police officer would believe that he was not asserting his right to remain silent. See Martin v. State, 107 So. 3d 281, 295 (Fla. 2012). Because his statements were equivocal, they did not constitute an invocation of his earlier-waived right to remain silent. See generally State v. Sepanik, 110 So. 3d 977, 979-80 (Fla. 2d DCA 2013) (discussing comments that have been held to be equivocal).
Bussey does not challenge the trial court's ruling regarding the detectives' comments appealing to Bussey's religion.

and must also have a 'causal nexus between the improper police conduct and the confession.' " State v. Walter, 970 So. 2d 848, 851 (Fla. 2d DCA 2007) (quoting Nelson v. State, 688 So. 2d 971, 974 (Fla. 4th DCA 1997)).

In Martin, the detectives "at times addressed the death penalty as a possible punishment." 107 So. 3d at 300. The detectives were attempting to locate the victim, who was missing, and the victim's last contact was with the appellant. The detectives did not know what had happened to the victim and were getting inconsistent stories from the appellant. The court opined that

> [t]he detectives' comments regarding the death penalty, and the realities of trial, were not made to incite fear in [the appellant], but were part of a larger conversation regarding possible penalties [he] could face in the absence of further explanation from him with regard to what happened the last time he and [the victim] were together.

Id. at 302. The court "interpreted" the detectives' statements "as representations to [the appellant] that [the victim's] disappearance may have been the consequence of an accident rather than some preconceived, evil plan." Id. The court stated that "both the purpose of the interview and the context in which this topic was addressed contrast significantly from that which [it] held induced a coerced, and therefore inadmissible, confession in" Brewer v. State, 386 So. 2d 232 (Fla. 1980). Martin, 107 So. 3d at 300. The court in Martin held that the references to the death penalty, combined with other tactics used by the detectives, did not render the appellant's confession involuntary. Id. at 298. The court analyzed the totality of the circumstances surrounding the confession and concluded that

> [l]aw enforcement must be afforded some leeway in how they conduct interrogations to ensure public safety and to further their objective of locating a missing person who might

- 5 -

> still be alive.  The interview here cannot be characterized as so coercive as to render [the appellant's] confession involuntary.  Although some of the tactics and techniques used by the detectives may have been less than ideal, [the detectives] did not directly threaten, deceive, or delude Martin into confessing.

Id. at 315-16.  The court nevertheless pointed out that "some of the techniques the detectives employed walked the line that separates permissible from impermissible interview tactics" and that the case "presents the very outer limit as to what tactics law enforcement may employ when performing a custodial interrogation."  Id. at 298.

The court in Martin relied on Walker v. State, 707 So. 2d 300 (Fla. 1997). In Walker, the court rejected the appellant's argument that the police's interrogation tactics were "so coercive as to render his confession involuntary."  Id. at 311.  As to the appellant's specific claims that the police threatened him with the electric chair and that a detective promised him that the detective could help him out, the court concluded that the detective merely "reminded [the appellant] that he could face the death penalty for the murders of the victims" and that he was "never threatened with the 'electric chair[]' or promised anything other than that [the detective] would inform the prosecutor that [the appellant] had cooperated in the investigation."  Id.

Both the Martin and Walker courts distinguished the earlier case of Brewer, on which Bussey relies.  See Martin, 107 So. 3d at 300; Walker, 707 So. 2d at 311 n.5.  In Brewer, 386 So. 2d at 235, the supreme court held that a confession was properly suppressed due in part to the fact that "[t]he officers raised the spectre of the electric chair."  386 So. 2d 232.  The police had evidence linking the appellant to a murder, id. at 233, and they confronted the appellant with evidence and told him twice that he would either face the electric chair or prison, id. at 233-34.  The court held that

the confession was also the result of suggestions by the police "that they had the power to effect leniency" and "that [the appellant] would not be given a fair trial." Id.

In analyzing Bussey's claim under the guidance of the cases cited above, we must look to the totality of the circumstances during the interview, including the conduct of the detectives. The record indicates that when the interview began, the detectives read Bussey his Miranda rights and that Bussey stated, "I'd love to clear my name. I'd love to." The detectives asked if Bussey had recently been to Florida, and Bussey stated that he had just returned from Florida a few days before the interview. Bussey had been told by his brother that the police in Florida believed Bussey had robbed a store, and the detectives told him that they were investigating a robbery at a store. When asked if he did it, Bussey answered "No, sir." The detectives encouraged Bussey to tell the truth if it was an accident "[b]ecause some things happen accidentally." Bussey denied ever going to the store in question, and when the detectives showed him photographs and a video taken from the store's surveillance cameras, he denied that it was him and he denied owning any of the items worn by the person in the photographs. The detectives told Bussey that "[i]t's not as bad . . . as what . . . you think it might be." They told Bussey that his fingerprints had been found on the counter at the store, and he continued to deny being there.

The detectives told Bussey that it was "[o]ne of two options," that he "either walked in that store to kill a man or [he] walked in there to do a robbery and something accidentally . . . went bad." Bussey repeatedly denied that he ever visited the store or committed the robbery, and he insisted that he was being honest with them. The detectives told him that he could get the "needle because of that damn—that stupid

- 7 -

way of thinking." Bussey continued to deny his involvement, and the detectives continued to tell him that he had two options. One detective said "[y]ou killed a guy in cold blood," and the other detective said "[y]ou made a mistake." They told him that they were going to bring his mother in, and he stated that she would confirm that it was not him on the video. They told him it was his life that he was dealing with. The following exchange occurred:

> DETECTIVE: Murder. Okay? Robbery. Okay?
>
> BUSSEY: (No audible response.)
>
> DETECTIVE: Do you see what I'm doing with my hands?
>
> BUSSEY: Uh-huh.
>
> DETECTIVE: Okay. Now, murder, planning out somebody getting killed. Right? That's premeditated. I want—just listen to me.
>
> BUSSEY: I'm listening.
>
> DETECTIVE: Say I wanna kill somebody, I plan it and I kill them. The highest you can go. Okay? Robbery. Somebody accidentally gets (inaudible). It wasn't meant for that to happen. Do you see what I'm doing?
>
> BUSSEY: Uh-huh.

The other detective wondered if Bussey is the worst person who "should live, ever, should be taken to death, or is this just a robbery that went bad." One detective told Bussey that "[t]his road you're taking makes me think that you're the wors[t] person in the world, . . . [t]hat you planned to kill this poor man." Bussey continued to deny his involvement, and the detectives continued to tell him that they had his fingerprints. Bussey told them that he was "not fixing to play with [his] life," and they told him "[y]ou are playing with your life because . . . the road that you're going down here right now is

not a good road." The detectives again addressed the difference between robbery and murder:

> DETECTIVE: Well, I mean, Darius, look. You want us to go on a first-degree murder—
>
> BUSSEY: —I'm being—
>
> DETECTIVE: —charge on you?
>
> BUSSEY: No. Don't charge me with nothing 'cause that's not me. I'm being honest with y'all. That's not me. I never been in that store. Never.
>
> DETECTIVE: Robbery, murder. That's what I'm trying to tell you. I can't explain it any easier.

The detectives told Bussey they thought it was a mistake and an accident, but then one detective said, "I'm going to look at it like it was intentional." They asked Bussey if he wants to see his mom get old, if he wants to be there if she passes away, and if he wants to be there at the funeral. When Bussey said "[o]f course," they told him "not the road you're taking right now." They then told Bussey that he is "going to miss everything." As the interview continued, they told Bussey numerous times that they thought he had made a mistake, that they wanted to save his life, and that he was not allowing them "to save part of [his] life." One detective stated that "a robbery that goes bad is down here and a murder up here. That's a huge difference. It's your life, sir." The detective said that "the last thing I want to do is see somebody get executed for a mistake that happened." The detective continued:

> What I try to do is save a young man's life because I think a mistake happened. That's what I think. That's what [the other detective] thinks. I don't think Darius had it out for this man. I don't think you had a beef for this man.
> . . . .

. . . Now, mistakes happen and people lose their lives with mistakes every day on the highway. People make a mistake, run through a red light, take out somebody. That's a mistake. Okay? Do they spend the rest of their lives in jail? No, 'cause it's a mistake. Okay? Robbery, yeah, it's bad, but it's not life. It's a robbery with a mistake versus "I don't like Mohammod [sic]. I wanna kill Mohammod [sic]."

. . . .

That's up here. That's premeditated murder. That is the highest and the baddest shit you can ever come across.

. . . .

Because I don't wanna see you end up here losing your life over a mistake. If it's a robbery and it was a mistake, down here.

. . . .

You honestly think you're gonna walk out of here with a misdemeanor? I already told you: down here, robbery with a mistake, premeditated murder.

The detectives again told Bussey that they had his prints and they were trying to figure out if he committed a robbery with a murder or if he committed premeditated murder. "Robbery is here. Murder is here. I don't know how—and I don't know any other easier way to explain it." Bussey continued to deny being at the store, and the detectives left to get Bussey's mother. A third detective walked in, and Bussey continued to deny his involvement to the third detective.

Bussey's mother entered the interview room without the detectives and urged him to talk to the detectives. She told him that she had seen the video and that he had been in that store. Bussey continued to deny his involvement. She also told him that mistakes and accidents happen and that she was trying to save his life. The two detectives reentered the room and told him that they were going to give him one last opportunity to talk about what happened at the store. Bussey again stated that he

- 10 -

was not at the store and had never gone to the store. One detective then told Bussey that they were charging him with "first-degree premeditated murder, which is a life, death sentence in the state of Florida, sir. . . . The rest of your life is done. It's over." The second detective immediately said "[i]f you don't want to talk about this." His mother then stated: "Listen. —the man explained to me, Darius, that if it was an accident, Son, you have a chance with your life. But if you just sit here and you don't say nothing, Son, you don't have a chance. It's over." The detectives then stated again that they would charge him with "premeditated murder, . . . which is a life sentence. And we will seek the death penalty in the State of Florida for this." One detective asked if Bussey wanted his mother "to watch you on the death penalty." Bussey's mother then pleaded with him to talk:

> Darius, if you was in the store, Baby, just tell them you was in the store. I'd rather come visit you in jail than to bury you, Son. I can't do that. I can't. Darius I can't do it. If it was an accident, Son, just talk. I can't help you if you don't talk. This man says life, Darius. Please, Son. I'm begging you for me, for your daughter, for your son. Give them the opportunity to be able to see you, even if it is behind a damn glass. Let them see you. Please. I'm begging you.
> . . . .
>
> Accidents happen, Baby. He just said it. Accidents happen. If it's an accident, you got a chance with your life. But if you don't talk, Son, you don't have a chance.

The detectives told him that he was not a cold-blooded killer and that it was a mistake. But they warned that if he continued to deny his involvement, they were going to end the interview and charge him with "first-degree murder" and "seek the death penalty." His mother then asked Bussey if he wanted the death penalty. Bussey asked, "[I]f it's a mistake robbery, what is my time?" One detective that said he was not going to talk

about time but that he would tell the state attorney if Bussey accepted responsibility. But the detective did promise that if Bussey continued to deny being in the store, the detective would be "seeking the death penalty." But the detectives reiterated that they could try to help him out if it was a mistake. Bussey asked three more times if they were going to charge him with "mistake of robbery." The detective said, "Darius, I'm gonna charge you with a robbery. Okay? But I need you to tell me what happened. I need you to be honest with me." It was at that point that Bussey said "I will" and then "I ain't even know the gun went off, to be honest." He then answered questions about the offense, explaining that he had ridden a bike to the store, that he had been wearing the clothes in the video but ditched them in a dumpster, that he threw the gun in a drain sewer, and that the gun went off accidentally. At the end of the interview, Bussey stated twice that "I just don't wanna get charged with no murder." He stated, "I'll be good with robbery, but I can't get charged . . . with no murder." One detective said, "It's not up to us," and the second detective said, "You can at least live now."

Based on the number of times the detectives referred to the death penalty, both explicitly and implicitly, we cannot conclude that the detectives were merely informing Bussey of the penalties he faced for the possible charges in this case. Cf. United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992) ("An official who encourages cooperation with the government and who informs the defendant of realistically expected penalties for cooperation and/or non-cooperation does not offer an illegal inducement."), abrogated on other grounds by Coleman v. Singletary, 30 F.3d 1420 (11th Cir. 1994). The purpose of the detectives' comments regarding the death penalty and saving Bussey's life was not to inform him of the penalties he faced. Cf.

- 12 -

Walker, 707 So. 2d 311.  Rather, the purpose of the comments was to instill fear in Bussey that he would face the death penalty with the hope that his fear would cause him to confess to the robbery and murder.  The detectives pressured Bussey by confronting him with the evidence against him and informing him that he had two options.  See Brewer, 386 So. 2d at 233-34; see also Martin, 107 So. 3d at 299 (analyzing the holding in Brewer: "This Court concluded that the trial court properly excluded the incriminating statements made by the defendant during his interrogation because the interrogating officers pressured the defendant by stating that, given the already available and incriminating evidence, the defendant had only two options— either the electric chair or time in prison.").

The detectives made repeated references to the different severities of the charges Bussey could face, with the charge of murder being "up here" and with robbery being "down here," much like the detectives in Martin.  See 107 So. 3d at 303 n.13, 308, 308 n.14.  But as the court made clear several times throughout the Martin decision, the primary goal of the detectives in that case was to find the missing victim.  Id. at 308 ("The fact that some of the detectives' statements may have led Martin to believe that he would never face a premeditated murder charge does not transform the detectives' words into misrepresentative and coercive statements.  These exchanges indicate that the detectives were, first and foremost, trying to locate [the victim].  This goal oriented the interview.").  In contrast, at the time of the interview in this case, the detectives had a clear picture of what had happened in the convenience store, due mainly to the surveillance cameras that captured the incident.  The detectives were not attempting to locate a missing victim; they were attempting to obtain a confession.  See Martin, 107

- 13 -

So. 3d at 300 n.12 (distinguishing the detectives' goal in <u>Martin</u> from that in <u>Brewer</u>, which "was to find (and assist in the conviction of) a suspected murderer").  At the time of the interview, the detectives knew what charges Bussey would likely face, and their suggestion to Bussey that he would be charged with robbery, and not murder, if it was a mistake was for the purpose of obtaining a confession.

And while the detectives accurately explained to Bussey that he could face the death penalty for the charge of premeditated murder, they repeatedly misled Bussey regarding what charges and penalties he could face if the victim's death was the result of what they referred to as an "accident" or "mistake," i.e., a robbery resulting in a death.  At the motion to suppress hearing, one of the detectives admitted that he used the word mistake many times:  "Yes.  I was minimizing it."  Even if Bussey had "accidentally" killed the victim during a robbery, Bussey could, and would likely, still face a charge of first-degree murder.  <u>See</u> § 782.04(1)(a)(2)(d), Fla. Stat. (2011).  In fact, the State proceeded on both theories of murder at trial, premeditated and felony murder. <u>See</u> <u>Kearse v. State</u>, 662 So. 2d 677, 682 (Fla. 1995) ("The State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder." (citing <u>O'Callaghan v. State</u>, 429 So. 2d 691, 695 (Fla. 1983))).  First-degree murder under the felony-murder theory is a capital felony that carries the possibility of the death penalty.  <u>See</u> §§ 782.04(1)(a)(2)(d), 775.082(1), Fla. Stat. (2011); <u>Washington v. State</u>, 103 So. 3d 917, 918 (Fla. 1st DCA 2012) ("Felony murder in Florida is a capital felony punishable by death or a mandatory sentence of life without the possibility of parole.").  The detectives misled Bussey into believing that if he confessed to the

victim's death being an accident, he would be charged with robbery, not murder, and he would not face the death penalty. It is clear that the detectives had also convinced Bussey's mother that he would face the death penalty if he did not confess to the victim's death being an accident and that he would not face the death penalty if the victim's death was an accident that occurred during a robbery. And even after he admitted to the robbery, Bussey was still under the impression that he would not be charged with murder, as indicated by his comments at the end of the interview.

We also note that the atmosphere of Bussey's interview suggests coercion. Cf. Martin, 107 So. 3d at 301-02 (noting that the interview "did not occur in an unduly oppressive environment"). The detectives told Bussey to sit down on several occasions, and on one occasion, one detective followed it up with: "Because I will put you back down. Okay?" Bussey began referring to the detectives as Mr. Jim and Mr. John. Later, one detective told Bussey to listen to him and to not interrupt him. And when Bussey later used the term "homey" to address one of the detectives, the detective stood up, told Bussey to not call him "homey" and to shut his mouth, and threatened twice to "straighten" Bussey out. Bussey then asked the detective to sit down and apologized, asking: "Can you accept my apology for calling you homey?"

Based on the totality of the circumstances, we conclude that Bussey's statements were the result of coercion. During almost the entire interview, Bussey adamantly denied his involvement in the robbery/murder, despite the detectives telling him that his fingerprints were found on the counter and despite the detectives showing him the surveillance footage. Bussey finally confessed after the detectives repeatedly referred to the death penalty and misrepresented that he would be charged with

robbery, rather than murder, if he confessed.  In light of the clear causal nexus between the detectives' conduct and Bussey's confession, we must conclude that his confession was involuntary and therefore inadmissible.

We must next determine whether the erroneous admission of Bussey's interview was harmless.  See Ross v. State, 45 So. 3d 403, 434 (Fla. 2010). "[H]armless error analysis must not become a device whereby the appellate court substitutes itself for the jury, examines the permissible evidence, excludes the impermissible evidence, and determines that the evidence of guilt is sufficient or even overwhelming based on the permissible evidence."  Id. (quoting State v. DiGuilio, 491 So. 2d 1129, 1136 (Fla. 1986)).

Other than the confession, the State introduced the still photographs from surveillance videos at the convenience store.  The photographs show the robbery and murder occurring from beginning to end, but we note that the quality of the photographs is poor and that the suspect was wearing a hat, making the suspect difficult to identify. The State also presented evidence that Bussey's palm print was found four times[3] on the counter where the suspect was seen to have placed his bare hand, and Bussey's uncle identified Bussey as being the person in the video.  In addition, there was evidence that Bussey owned clothes and shoes matching those worn by the person in the video and that Bussey fled to Georgia after the offenses.  The State's other evidence against Bussey was compelling and more than sufficient to support a conviction.

---

[3]One of the palm prints also included a print of Bussey's left ring finger.

Nonetheless, Bussey's statement to police was particularly incriminating and was relied upon by the State heavily during the evidentiary portion of the trial and during closing argument. In arguing that Bussey was the person in the surveillance videos, the prosecutor pointed to statements made in the interview indicating that Bussey's mother and aunt had recognized Bussey from the surveillance video. In addition, much of the State's closing arguments focused on the statements made by Bussey during the interview. See Wright v. State, 161 So. 3d 442, 452 (Fla. 5th DCA 2014) ("The erroneous admission of a confession is harmful when the state relies on and repeatedly emphasizes the statement in closing argument and the defense attempts to show the statement was coerced."). Therefore, we cannot say beyond a reasonable doubt that there is no reasonable possibility that the admission heard by the jury did not contribute to the first-degree murder conviction. See Ross, 45 So. 3d at 434 ("[I]n this case, there was evidence of the defendant's guilt, including physical evidence. However, the statements that the defendant made . . . were relied on by the State to prove his guilt and repeatedly emphasized.").

Accordingly, we must reverse Bussey's conviction and remand for a new trial at which the evidence of his statements must be suppressed.

Reversed and remanded.


BLACK and SLEET, JJ., Concur.