# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Johnathan Lamar Hillary, Appellant.

Appellate Case No. 2019-001048

———————

Appeal from Horry County
William A. McKinnon, Circuit Court Judge

———————

Opinion No. 6015
Heard June 15, 2023 – Filed August 16, 2023

———————

## AFFIRMED IN PART AND VACATED IN PART

———————

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Senior Assistant Attorney General J. Anthony Mabry, all of Columbia, and Solicitor Jimmy A. Richardson, II, of Conway, all for Respondent.

———————

**GEATHERS, J.:** Johnathan Lamar Hillary (Hillary) challenges his convictions for murder, armed robbery, kidnapping, and possession of a weapon during the commission of a violent crime. He argues that (1) a statement he gave to law enforcement, admitted into evidence at trial, was not voluntary; (2) evidence concerning a separate robbery allegedly committed by Hillary should not have been

admitted at trial; and (3) the sentence for kidnapping was improper given that Hillary was also convicted and sentenced for murder.  We affirm in part and vacate in part.

## FACTS/PROCEDURAL HISTORY

In the fall of 2016, Kaitlin Buckley (Kaitlin) reported to police that her father, Timothy Buckley (Buckley), was missing.  At that point, the elder Buckley had not been heard from for several days.[1]  Family members and friends joined the search for Buckley, a retired police officer.

Among those involved in the search were Carl Wenner and his brother, who was a lifelong friend of Buckley.  The two men found Buckley's truck around October 5, 2016, on 29th Street in Myrtle Beach.  The bloodied passenger side of the vehicle interior indicated that Buckley's fate was likely dire, but neither Buckley nor his body were immediately found.  John Caulder, a crime scene investigator, found tissues in some of the blood indicating an unidentified individual might have been shot in the head.

Buckley's body would not be recovered until around November 10, when two young men on a before-school excursion came upon what one of the men believed to be a dead animal; his companion realized instead that the badly decomposed corpse was human.  According to a subsequent autopsy, Buckley had been killed when he was shot in the back of the head.

Following a request from Horry County authorities, law enforcement in Georgia tracked Hillary to a townhouse in Atlanta.[2]  Based on the probation status of an individual at the unit, law enforcement began searching the home.[3]  There, officers found a revolver hidden in an upstairs bathroom.  The serial number of that revolver matched the serial number of a revolver belonging to Buckley.  Additionally, on the first floor of the townhouse, officers found a holster that had a broken snap—a characteristic of Buckley's holster, according to Kaitlin.  Credit cards, a driver's license, and various other forms of identification under the name

---

[1] It appears that September 28 was the last day on which Buckley was heard from.

[2] The circumstances of this request are not entirely clear in the record.  A state member of the U.S. Marshals Fugitive Task Force in Georgia said that the force "received [a] lead and said that we needed to try to locate Mr. Hillary for the Horry County Police Department."

[3] Investigator Bradley Mark Willis testified that an initial search turned up a firearm, prompting a more thorough inspection.

"Bocar Bah" were also found in the townhouse.[4]  There were indications that Hillary and Bernithia Young (Young) resided in the upstairs portion of the townhouse.

While Hillary was held in Georgia, two Horry County detectives—Gregory Lent and David Dudley—traveled to Atlanta to interrogate him about Buckley's murder.[5]  Hillary initially told the detectives that on the night Buckley disappeared, Hillary had given fake methamphetamine to a haggard man on the street in exchange for a chance to drive the man's truck.  Hillary said he later abandoned the truck and threw the keys aside after the man began persistently calling Hillary's phone.  Hillary then arranged for Young to pick him up.

During the interrogation, the detectives continued to draw out Hillary's version of events.  Then, they started trying to poke holes in it.  At one point, apparently frustrated by Hillary holding to his story, Detective Lent said: "Let him go back to South Carolina and he can tell it to a jury when they give him the death penalty."[6]  At another point, Lent discussed some of the possible reasons for a conflict between Hillary and Buckley in the moments before Buckley's murder.  Perhaps, Lent suggested, "[s]omeone tried hurting [Hillary] and [he] had to do what [he] had to do to defend [himself]."  Lent also made clear that cooperation was in Hillary's best interest; he told Hillary that if Hillary did not "explain" the slaying, "I'm going to walk out those doors and I'm going to sing the story that John Hillary don't give a s**t about nobody and that he's a cold-blooded killer."  Later, Lent told Hillary: "I told you, I'm not asking if you did it or not.  I'm asking you what happened.  I'm asking you how it happened.  I'm asking you to provide some story that might just save your a**."  Detective Dudley said:  "Let's put it like this[:] When a jury sees you driving around in the truck for hours with blood on the inside with no remorse for what you did, you think they're going to hesitate to put a needle in your arm?"

The two detectives applied other techniques as well.  They misled Hillary about the quantity and quality of evidence against him.  Detective Lent indicated

---

[4] Similar items belonging to individuals with the last name "Sitler" were also present.

[5] According to one of Hillary's filings at the circuit court, this interrogation took place on November 18.

[6] The quotes reproduced here are drawn in part from the transcript provided at trial and in part from the interrogation's recording, which differ in largely inconsequential ways.  At certain points, chiefly for clarity, we have altered the transcript or its punctuation to conform to the recording.  The audio was played for the jury at trial, but certain portions of the interrogation were redacted.

Hillary could "come up with a lie" explaining Buckley's death.[7] Detective Lent again posed potential narratives, including: "Maybe [Buckley] rolled up on you looking for sex." Eventually, Hillary began to tentatively suggest he might talk.

| | |
|---|---|
| Hillary: | If I tell . . . |
| Det. Lent: | If you, if you're honest with me, it at least goes towards showing remorse. It goes towards helping that man's family understand why. Dude, they're burying him this weekend. You know what they got to bury? Probably a cardboard box about that big. With some loose f*****g bones in it. That's all they got. |
| Det. Dudley: | You tell us the truth and we'll help you. We ain't going to hang you out to f*****g dry. So tell us the truth, John. |
| Det. Lent: | Dude, you're probably, it's probably been eating you up for the last 50 days. Whatever it's been. You're right, I have looked at your criminal history. It ain't nearly as bad as a whole bunch of others that I've seen here. |
| Hillary: | I'm not that, I'm not a bad person, man. |

Within moments of that exchange, Hillary began to unspool a new story. He told the detectives to "[p]ut yourself in this scenario," suggesting that Buckley had picked Hillary up on the road and attempted to sexually assault him in the truck. Hillary gradually seemed to abandon this framing of his narrative and tell the detectives what he claimed had happened. According to Hillary, Buckley pulled a gun. Hillary was able to grab the gun in a struggle between the two men.

Hillary said he fled through the passenger-side window of the truck with Buckley "on my tail." Hillary then said he used Buckley's gun to "defend" himself because he was worried that Buckley might have another firearm. Hillary said he

---

[7] The detectives, at other times, indicated they were interested in the truth.

did not know where the first shot he fired hit Buckley. The detectives then pressed Hillary on a second shot.

| | |
|---|---|
| Det. Lent: | So now here, here's the question. The second time you shot him, where[8] did you have to shoot him to make sure that, that he wasn't suffering? |
| Hillary: | That he wouldn't end up, he wouldn't attack me no more. I just want[ed] to make sure. |
| Det. Lent: | Right. |
| Hillary: | You know what I mean but . . . |
| Det. Lent: | But where on his body did you shoot him? |
| Hillary: | I don't know. |
| Det. Lent: | The second time you shot him? |
| Hillary: | I don't know. I just, it wasn't premeditated. It wasn't no, it wasn't no thought about it, you know, it just . . . |
| Det. Lent: | How many times did you end up shooting him? How many times did you fire the gun that night [inaudible] to protect yourself; two times? |
| Hillary: | Twice. |
| Det. Lent: | Ok. Alright. The reason why I ask, 'cause obviously when we go out there, |

[8] The transcript has "why" here. Based on our review of the recording, Detective Lent asked Hillary a question about where Hillary shot Buckley. At the same time, Hillary's answer appears to show that he interpreted the question as one about why he shot Buckley again.

|  | right where we found him, he had a gunshot wound to his head. |
|---|---|
| Hillary: | Oh, did he?  I ain't aim to hit him in his head. |

Hillary said that after the shooting, he left the body nearby.  Hillary also appeared to admit to taking some money, an admission that followed after Dudley's comments that "[i]t's not like we're going to slap a robbery charge on you, ok.  Please don't worry about that, that's not what we're after."  Hillary also said he met up with Young, and they disposed of the truck.

Hillary was charged with murder, armed robbery, kidnapping, and a felony involving the use of a deadly weapon.  The State did not seek the death penalty.

At trial, more than twenty witnesses testified over five days.  That included testimony at hearings held to determine whether Hillary's statement to police was voluntary and whether the jury could hear about the robbery of a truck driver named Bocar Bah.

Regarding the first issue, Detective Lent and Hillary both testified about the interrogation.  Detective Lent said the interrogation was an example of "progressive truth telling . . . when the interview subject will begin to tell one part of the truth, and then as the interview goes on[,] we'll add other information as he is presented with evidence that we have in, in the case."  Detective Lent denied that his statements invoking the death penalty were meant to threaten Hillary with capital punishment and agreed with the State's contention that the detectives never promised Hillary that the State would not seek the death penalty.  Detective Lent answered in the negative when asked whether Hillary "ever appear[ed] scared, fearful or threatened by the mention that he could possibly face the death penalty."

For his part, Hillary said the statement was an attempt to avoid capital punishment.  "I told them what they wanted to hear because they felt like I need to tell them something to help myself.  They didn't want me to tell them the truth."  Under cross-examination by the State, Hillary repeated his original story of the haggard man and the fake drugs.  Hillary also suggested that the details mentioned by the detectives informed the narrative he gave.  "They told me the scenario.  They wanted my side of the offense and they elaborated on details that I had no idea of knowing about until they mentioned them to me."

The circuit court ruled that the statement could be admitted at trial.  The court found that the officer's comments about capital punishment were "with regard to the

jury imposing the death penalty, not a threat the officers are going to do it or the officers are going to manipulate the system." The court also did not view any of the statements made by the detectives during the interrogation as guaranteeing leniency to Hillary.

The court also considered whether the jury could hear the story of a truck driver from Memphis named Bocar Bah (Bah), who testified about an alleged robbery in Summerville. On a previous trip to South Carolina, Bah testified, he had met Young at a convenience store.[9] They exchanged phone numbers. Ahead of a trip in November, Bah called Young to ask about the possibility of a liaison in South Carolina. She agreed.

The pair met at a Walmart. Bah said Young was driving a white Chevrolet Impala. After purchasing some alcohol, the two drove to a hotel. At the same time, Bah noticed that Young was texting with an unidentified correspondent. At the hotel, when Bah stepped out of the car, a male stepped behind Bah and ordered him to "[l]ay on the ground." "Don't, don't try me. I will shoot you," the man said. Bah gave the man his wallet and phone. During his testimony at the pretrial hearing, Bah suggested that Hillary pretended to make Young come with Hillary unwillingly.

Bah later identified Hillary and Young in a lineup. At trial, Bah testified that Hillary's gun was a semiautomatic, and he identified the gun. Bah, however, conceded on cross-examination that his testimony was different in some respects from what he initially told law enforcement. For example, Bah admitted that he originally did not tell officers he had met Young before that night.

After hearing testimony from Bah and Summerville Police Officer Chris Cooper, the circuit court found the evidence of the robbery admissible. Specifically, the court found that the robbery of Bah and the alleged attempt to rob Buckley was part of a common scheme or plan because "there's a strong connection[:] both robberies of single male victims, they're both driven away in the white Impala, cash from a wallet was stolen in both cases, and then obviously, the, the most, the strongest parallel is the communications between Mr. Hillary and Ms. Young, the text messages and the phone calls . . . ."

During the trial, jurors heard about the movements of the vehicles connected to the case during the evening of September 28 and the morning of September 29, as observed by Myrtle Beach traffic cameras. Additionally, Scott Eicher, a retired

---

[9] We have incorporated aspects of Bah's testimony both at trial and during the pretrial hearing into this narrative.

FBI agent and consultant, testified about the location of cell phones owned by or associated with Hillary, Young, and Buckley around the time when Buckley was believed to be murdered. The evidence heavily suggested that Hillary and Buckley, in particular, were in several of the same areas around the time of Buckley's murder.

After little more than an hour of deliberations, the jury convicted Hillary on all charges. The circuit court sentenced Hillary to life in prison for the murder charge; thirty years for the armed robbery; thirty years for the kidnapping charge; and five years on the weapons charge, all to run concurrently. This appeal followed.

## ISSUES ON APPEAL

I. Did the circuit court err in finding that Hillary's statement was voluntary, despite the detectives' alleged threats and promises of assistance?

II. Did the circuit court err in allowing the testimony about the robbery of Bah under Rule 404, SCRE?

III. Should this court vacate Hillary's sentence for kidnapping because he was also sentenced for murder?

## STANDARD OF REVIEW

We discuss the standard for review regarding some of Hillary's individual claims in greater detail below. However, we must keep in mind the limited scope of our review in all criminal matters. "In criminal cases, the appellate court sits to review errors of law only. This court is bound by the trial court's factual findings unless they are clearly erroneous." *State v. Parker*, 381 S.C. 68, 74, 671 S.E.2d 619, 621 (Ct. App. 2008) (citations omitted).

## LAW/ANALYSIS

## I. VOLUNTARINESS OF THE STATEMENT

Hillary argues that his statement to police about the circumstances of Buckley's death was not voluntary. We disagree.

"On appeal, the trial judge's ruling as to the voluntariness of the confession will not be disturbed unless so erroneous as to constitute an abuse of discretion." *State v. Moses*, 390 S.C. 502, 510–11, 702 S.E.2d 395, 399 (Ct. App. 2010) (quoting *State v. Myers*, 359 S.C. 40, 47, 596 S.E.2d 488, 492 (2004)). "When reviewing a trial court's ruling concerning voluntariness, this [c]ourt does not reevaluate the facts

based on its own view of the preponderance of the evidence, but simply determines whether the trial court's ruling is supported by any evidence." *State v. Johnson*, 422 S.C. 439, 454, 812 S.E.2d 739, 747 (Ct. App. 2018) (alteration in original) (quoting *State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001)).

We do not wish to proceed without saying candidly that we are uneasy with the full sweep of the police officers' interrogation tactics in this case. However, we find that Hillary's statement was voluntary.

> In South Carolina, the test for determining whether a defendant's confession was given freely, knowingly, and voluntarily focuses upon whether the defendant's will was overborne by the totality of the circumstances surrounding the confession. Courts have recognized appropriate factors that may be considered in a totality of the circumstances analysis: background; experience; conduct of the accused; age; maturity; physical condition and mental health; length of custody or detention; police misrepresentations; isolation of a minor from his or her parent; the lack of any advice to the accused of his constitutional rights; threats of violence; direct or indirect promises, however slight; lack of education or low intelligence; repeated and prolonged nature of the questioning; exertion of improper influence; and the use of physical punishment, such as the deprivation of food or sleep.

*Moses*, 390 S.C. at 513–14, 702 S.E.2d at 401 (citation omitted); *see also State v. Arrowood*, 375 S.C. 359, 367, 652 S.E.2d 438, 442 (Ct. App. 2007) ("A statement 'may not be extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of improper influence.'" (alterations in original) (quoting *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990))).

Given our "any evidence" standard of review and the existence of an uncontradicted audio recording of the interview, our task here is narrow and straightforward. If the actions and statements of the officers as captured on the recording can support the circuit court's view that the confession was voluntary under our state's precedents, we should affirm. Put another way, reversal would be proper only if the events on the recording *cannot* support the circuit court's ruling.

We find the detectives went up to the line of what is permissible under our precedents. No doubt, there are some troubling aspects of the interrogation. Judging by the evidence presented at trial, the detectives who interrogated Hillary repeatedly misrepresented the strength of the State's case at that point. They invoked the specter of the death penalty twice, even if they did not directly threaten Hillary's life. We find it particularly concerning that the detectives outlined potential stories that Hillary could tell and seemingly encouraged him to "come up with a lie" if he wanted to do so—shortly before floating the scenario that "[m]aybe [Buckley] rolled up on you looking for sex." That, of course, would end up nearly matching the explanation Hillary gave during the later stages of the interrogation for how he came to take Buckley's life.

Our courts have previously expressed disapproval of some tactics similar to those that Detective Lent and Detective Dudley used here. For example, in *State v. Peake*, our supreme court ruled that a confession should have been excluded when the officer answered affirmatively to a question about whether the officer had promised "that if [the defendant] would give you a statement . . . you would guarantee to him that you would not seek the death penalty." 291 S.C. 138, 139, 352 S.E.2d 487, 488 (1987). However, the court also ruled that "[a] statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise." *Id.*

In this case, it does not appear that Hillary was promised leniency. At most, the officers assured Hillary that they would put in the proverbial good word for him—that they would not "hang [him] out to f*****g dry" when they talked to prosecutors. That is similar to the interrogation this court considered in *Arrowood*. There, the circuit court relied on testimony by law enforcement that "the only 'help' they offered Arrowood was to testify in court that he cooperated with the investigation." *Arrowood*, 375 S.C. at 368, 652 S.E.2d at 443. Our court held that "the officers' offer to attest to Arrowood's cooperation did not constitute promises of leniency. Consequently, Arrowood produced his statements in the mere 'hope' of leniency based on his cooperation, rather than as the consequence of promises." *Id.* at 368–69, 652 S.E.2d at 443 (citations omitted).

Here, as in *Arrowood*, the officers were not promising leniency; if the officers followed through on their offer, it would provide Hillary with "the mere 'hope' of leniency based on his cooperation." *See also Parker*, 381 S.C. at 91, 671 S.E.2d at 631 ("[D]iscussions of realistic penalties for cooperative and non-cooperative [defendants] . . . are normally insufficient to preclude free choice." (third alteration in original) (quoting *United States v. Mendoza–Cecelia*, 963 F.2d 1467, 1475 (11th

Cir. 1992), *abrogated on other grounds by Davis v. United States*, 512 U.S. 452 (1994))).

Further, our courts have found that glancing references to the death penalty do not automatically render a statement involuntary. *See Johnson*, 422 S.C. at 456, 812 S.E.2d at 748 (affirming the circuit court's ruling even though talk of capital punishment "was not really a 'discussion' of possible penalties but a statement that keeping up this 'b[***]s[***] story' was going to land him in prison for life if not the death penalty" because "this comment was isolated, and the death penalty was a possible sentence for the crimes at issue").[10]  Likewise, our courts have been hesitant to throw out statements encouraged by officers' false statements. *See id.* ("[C]ourts have routinely held the misrepresentation of evidence does not render a confession involuntary unless it is demonstrated the free will of the defendant was overborne."); *see also State v. Goodwin*, 384 S.C. 588, 603, 683 S.E.2d 500, 508 (Ct. App. 2009) ("While we do not condone the officers' statements regarding their evidence and [threatening the appellant's] family, we do not find they overbore [the appellant's] will.").

Here, we find that even if the officers' tactics were at the extreme end of the allowable spectrum, they informed Hillary's mental calculation about whether to confess, rather than overbearing his will. *See Parker*, 381 S.C. at 89, 671 S.E.2d at 630 ("It is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect. . . .  These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." (alteration in original) (quoting *State v. Von Dohlen*, 322 S.C. 234, 244, 471 S.E.2d 689, 695 (1996), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019))).

As part of his argument that the statement was involuntary, Hillary relies in part on *Bussey v. State*, 184 So.3d 1138 (Fla. Dist. Ct. App. 2015).  Hillary says that the two cases represent a "strikingly similar factual scenario."  We disagree.

The court in *Bussey* found that "detectives misled Bussey into believing that if he confessed to the victim's death being an accident, he would be charged with robbery, not murder, and he would not face the death penalty." *Id.* at 1146–47. Bussey's mother was brought in and told Bussey that she would "rather come visit

---

[10] The *Johnson* court also noted:  "Johnson did not recant his [initial] story until well after the death penalty was mentioned, and it does not appear to have overborne his will." *Id.*

you in jail than to bury you." *Id.* at 1145. The *Bussey* court also held that officers "repeatedly misled Bussey regarding what charges and penalties he could face if the victim's death was the result of what they referred to as an 'accident' or 'mistake,' i.e., a robbery resulting in a death." *Id.* at 1146.

While Detective Lent and Detective Dudley used some similar techniques to encourage Hillary to confess, their actions fall short of the sustained pressure campaign that prompted the *Bussey* court's ruling.[11]

Given all of these considerations, we find that the record presented at trial provides some evidence to support the circuit court's finding of voluntariness.

## II.   SUBSEQUENT BAD ACTS EVIDENCE

Hillary argues that the circuit court erred in admitting evidence concerning the robbery of Bah. We agree, but we find that any error in admitting the testimony was ultimately harmless.

"The [circuit court] has considerable latitude in ruling on the admissibility of evidence[,] and his decision should not be disturbed absent prejudicial abuse of discretion." *State v. Cope*, 405 S.C. 317, 334–35, 748 S.E.2d 194, 203 (2013) (quoting *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009)).

"[E]vidence of other distinct crimes committed by the accused may not be adduced merely to raise an inference or to corroborate the prosecution's theory of the defendant's guilt of the particular crime charged." *State v. Lyle*, 125 S.C. 406, 416, 118 S.E. 803, 807 (1923). However,

> [g]enerally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish, (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan

---

[11] Further, Hillary's passing reference to this court's opinion in *State v. Hook*, 348 S.C. 401, 559 S.E.2d 856 (Ct. App. 2001), can be distinguished; in that case, the appellant was not even Mirandized. *Id.* at 412–13, 559 S.E.2d at 861. Likewise, we find Hillary's reliance on *State v. Corns* unavailing. *See* 310 S.C. 546, 426 S.E.2d 324 (Ct. App. 1992). We do not read *Corns* to say that a "change in demeanor" is a decisive consideration on the voluntariness of statements, and while there is a change in tone by Hillary in the audio of the interrogation, we find it is not marked enough to indicate that his will was "overborne."

embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial.

*Id.* (quoting *People v. Molineux*, 61 N.E. 286, 294 (N.Y. 1901)). Under *Lyle*, the use of the common scheme or plan exception "involves the establishment of such a visible connection between the extraneous crimes and the crime charged as will make evidence of one logically tend to prove the other as charged." *Id.* at 427, 118 S.E. at 811.

This court has observed the interplay between various standards of review when the State invokes the common scheme or plan exception.

Ordinarily, questions concerning the admissibility of evidence are treated as questions of fact. However, there are several cases in which the trial judge's admission of evidence under the common scheme or plan exception was reversed after the appellate courts in South Carolina found that the similarities between the charged and uncharged acts were insufficient to establish the existence of such a plan or design. Certainly, *the factual determination as to whether the prior assault occurred* in this case is left to the discretion of the trial judge. However, in light of these authorities, we believe *the determination of whether the facts surrounding that assault sufficiently evidence a common scheme or plan is a question of law*.

*State v. Tutton*, 354 S.C. 319, 326–27, 580 S.E.2d 186, 190 (Ct. App. 2003) (citations omitted) (emphases added). As a result, we do not need to focus on whether Bah's allegations against Hillary were true. Instead, we find it easy to conclude that the circuit court did not abuse its discretion in determining that the State had presented clear and convincing evidence of the robbery. *See id.* at 325, 580 S.E.2d at 189 ("When considering whether there is clear and convincing evidence of other bad acts, this court is bound by the trial judge's factual findings unless they are clearly erroneous."). However, we must more closely consider the finding that there was a sufficient connection between the alleged robbery of Bah and the murder of Buckley to allow the jury to hear Bah's testimony.

Our supreme court has "held that the connection between the prior bad act and the crime must be more than just a general similarity." *State v. Parker*, 315 S.C.

230, 233, 433 S.E.2d 831, 832 (1993). Furthermore, "[i]t is not enough to meet the 'logical connection' standard for admission of other crimes under the common scheme or plan exception to Rule 404(b) that the defendant previously committed the same crime." *State v. Perry*, 430 S.C. 24, 41, 842 S.E.2d 654, 663 (2020). "There must be something in the defendant's criminal process that logically connects the 'other crimes' to the crime charged." *Id.*

The State's argument that Bah's alleged experience with Hillary and Buckley's murder were part of a common scheme or plan is weakened by the almost complete lack of evidence that the two were, in fact, common to each other in any particularly meaningful way. Without more evidence to that effect, we do not have sufficient reason—and the circuit court did not have sufficient reason—to connect the "criminal process" of the alleged robbery of Bah to the "criminal process" of the murder of Buckley.

For example, the State contends in its brief that "[c]ell phone records evidence supports that the victim Buckley first contacted [Young] at approximately 3 a.m. on September 29, 2016." That is incorrect, as the State conceded in a letter to this court after oral arguments. The citation used by the State in fact appears to point to testimony supporting only "a general indication that both the victim's phone and Ms. Young's phone were in the same area at the same time."

Instead, there is no evidence anywhere in the record of electronic contact between Young and Buckley—the very kind of communication that allegedly set in motion the robbery of Bah. Indeed, the State's own expert testified that there was no evidence that Buckley communicated with either Young or Hillary in the critical hours when the crime is believed to have been committed:

> So this was Ms. Young's phone, Mr. Hillary's phone and
> the victim's phone, and you can see the victim's phone here
> is not making any contact with any of these two other
> phones, but we do see a lot of contact between the Young
> phones and Mr. Hillary's phone.

Given the evidence that Young had multiple phones, there is a possibility that another phone was contacted by Buckley. It is also possible that Buckley somehow came into contact with Young somewhere in the general area of a camper that belonged to Buckley. However, that is nothing more than speculation. It is certainly not the type of evidence of a connection between the two crimes that can allow the State to qualify for the exceptions found in *Lyle*.

To the extent that the geolocation data shows that Young was in the "area" of Buckley's camper, the State offered one point of data showing that her phone used a tower that made it likely she was somewhere within a 120-degree arc, some of which overlapped with Buckley's camper. Neither the State nor Hillary called Young to testify about her role—if any—in the incident involving Buckley.

Furthermore, a chart of "similarities" between the two crimes used by the State at trial contains many of the same generalities that our courts have found insufficient to establish a common scheme or plan. Among the similarities are "incident occurred in SC," "male victim," "def[endant]s came from G[eorgia]"—where, again, they lived at least some of the time—and "def[endant]s used cell phone." Some of the other similarities are stronger. Indeed, we cannot ignore that credit cards, a driver's license, and other items linked to Bah were found at Hillay's location. However, we find that these similarities and connections are not strong enough to say that the two offenses are the result of the same "criminal process."

We do not mean to suggest that the State needs to present a perfect match between two crimes to argue that they are part of a common scheme or plan. We also do not question the circuit court's view of the evidence that a carjacking or armed robbery scheme or plan involving Hillary and Young existed. However, we do not believe that the State produced enough evidence in this case to show that *the murder of Buckley* was part of that scheme or plan. *See Lyle*, 125 S.C. at 417, 118 S.E. at 807 (finding that, in considering admission of other bad acts, "[t]he acid test is its logical relevancy to the particular excepted purpose or purposes for which it is sought to be introduced"). Given that, admitting evidence of the robbery of Bah under the common scheme or plan exception was error.

At the same time, we find this error to be harmless. *See State v. Reyes*, 432 S.C. 394, 406, 853 S.E.2d 334, 340 (2020) ("In determining whether error is harmless beyond a reasonable doubt, we often look to whether the 'defendant's guilt has been conclusively proven . . . such that no other rational conclusion can be reached.'" (quoting *State v. Collins*, 409 S.C. 524, 538, 763 S.E.2d 22, 29–30 (2014))).

Here, no other rational conclusion can be reached but that Hillary murdered Buckley. The cell phone evidence does not prove that Buckley's murder was part of a common scheme or plan, but it is nonetheless damning on the question of whether Hillary was involved in Buckley's death. Concluding that the mutual locations were happenstance would require not so much a reasonable doubt as a suspension of disbelief. Hillary's statement places him in the truck, and the location of the

Buckley's gun and holster at a home where Hillary was living in Georgia can hardly be a coincidence.[12]

The only element of the crime of murder on which the jury's considerations could have been tainted by Bah's testimony was on the issue of malice—the dividing line between murder on one side and voluntary manslaughter, involuntary manslaughter, or self-defense on the other. However, we find beyond a reasonable doubt that there is overwhelming evidence in the record from which the jury would have inferred malice regardless. The evidence that Buckley was shot in the back of the head and the evidence that he was shot twice both indicate the presence of malice. Additionally, we note that the jury convicted Hillary of armed robbery and kidnapping—both of which are felonies. *See State v. Avery*, 333 S.C. 284, 294, 509 S.E.2d 476, 481 (1998) ("If a person intentionally kills another during the commission of a felony, malice may be inferred."); S.C. Code Ann. § 16-3-910 (defining kidnapping as a felony); S.C. Code § 16-11-330(A) (defining armed robbery as a felony); *see also State v. Burdette*, 427 S.C. 490, 503, 832 S.E.2d 575, 582 (2019) ("[A] trial court shall not instruct the jury that it may infer the existence of malice when the deed was done with a deadly weapon," but "if evidence is introduced that the deed was done with a deadly weapon, the State is free to argue to the jury that it should infer the existence of malice based on that fact and any other facts that would naturally and logically allow a jury to conclude the defendant acted with malice aforethought."); 41 C.J.S. *Homicide* § 285 (as of May 2023 update) ("Malice may be inferred from the circumstances surrounding a defendant's conduct and the events leading up to the death of the victim.").

As a result, we find that evidence related to the robbery of Bah should not have been admitted, but that the error was harmless.

## III.   CONVICTIONS FOR MURDER, KIDNAPPING

---

[12] The State proceeded under the theory that Hillary had used his own gun for the shooting. That gun was also found at the townhouse. However, the State did not point to any forensic evidence linking the gun used in the robbery of Bah with Buckley's murder; indeed, there could be no forensic evidence in the robbery of Bah because the gun was not fired. Additionally, no bullets or casings were found in Buckley's truck. *See State v. Cheeseboro*, 346 S.C. 526, 546, 552 S.E.2d 300, 311 (2001) ("In this case, *there is forensic evidence* that the same gun was used in both the barbershop and cab driver shootings. *This fact* establishes a substantial connection between the two crimes that supports the admission of evidence regarding the cab driver murder." (emphases added)).

Hillary finally contends that he should not have been sentenced for both kidnapping and murder. This issue was not preserved for appeal. However, for the sake of judicial economy, we will vacate the improper sentence for kidnapping.

Section 16-3-910 of the South Carolina Code (2015) provides: "Whoever shall unlawfully seize, confine, inveigle, decoy, kidnap, abduct or carry away any other person by any means whatsoever without authority of law . . . upon conviction, must be imprisoned for a period not to exceed thirty years unless sentenced for murder as provided in Section 16-3-20."

As the State points out, Hillary did not raise this issue in the circuit court. Hillary contends that we can and should vacate the sentence in any case under *Owens v. State*. *See* 331 S.C. 582, 585, 503 S.E.2d 462, 463 (1998) ("The [c]ourt has summarily vacated life sentences for kidnapping when the defendant received a concurrent sentence under the murder statute.").

Principles of judicial economy favor vacating the sentence in this case. *See State v. Vick*, 384 S.C. 189, 202, 682 S.E.2d 275, 282 (Ct. App. 2009) ("While the case at hand does not present a threat that [the appellant] will remain incarcerated beyond the legal sentence . . . our courts have, in the past, 'summarily vacated' sentences for kidnapping where such sentences were precluded . . . because the defendant received a concurrent sentence under the murder statute."); *id.* ("Additionally, our courts have at times considered an issue in the interest of judicial economy."); *State v. Bonner*, 400 S.C. 561, 566, 735 S.E.2d 525, 527 (Ct. App. 2012) ("[T]here is an exceptional circumstance when 'the State has conceded in its briefs and oral argument that the trial court committed error by imposing an excessive sentence.'" (quoting *State v. Johnston*, 333 S.C. 459, 463, 510 S.E.2d 423, 425 (1999))); *cf. State v. Plumer*, 439 S.C. 346, 351, 887 S.E.2d 134, 137 (2023) ("On occasion, we encounter illegal sentences to which no objection was taken in the trial court. In such cases, it is inefficient and a waste of judicial resources to delay the inevitable by requiring the appellant to file a post-conviction relief action or petition for a writ of habeas corpus.").

Here, the State does not specifically acknowledge in its brief that the sentence was wrongly imposed, instead stressing the importance of issue preservation. The State argues that one of our precedents "does not apply" and asserts that "this [c]ourt has been inconsistent in adherence to the [c]ourt's precedent to unpreserved sentencing issues." We note that *Vick* and *Bonner* have not been overruled by our supreme court. There is no cognizable legal argument the State can raise that this sentence was properly imposed. Nor do we believe that the interests of our state's justice system are served by requiring Hillary to go through a collateral appeal

process to attack a facially invalid sentence that will not actually affect the length of his imprisonment. We vacate the kidnapping sentence as a result.

## CONCLUSION

For the reasons stated above, the ruling of the circuit court is

**AFFIRMED IN PART AND VACATED IN PART.**

**HILL, A.J., and LOCKEMY, A.J., concur.**